UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

OTIS COLE,

            Petitioner,

v.                                Case No. 12-14826
                                Honorable Matthew F. Leitman

KEN TRIBLEY,

            Respondent.

_____/

**OPINION AND ORDER
DENYING THE PETITION FOR WRIT OF HABEAS CORPUS (ECF #1),
DECLINING TO ISSUE A CERTIFICATE OF APPEALABILITY, AND
DENYING LEAVE TO PROCEED *IN FORMA PAUPERIS* ON APPEAL**

## I. Introduction

Petitioner Otis Cole ("Petitioner") has filed a *pro se* application for a writ of habeas corpus under 28 U.S.C. § 2254. (*See* the "Petition," ECF #1.) The Petition challenges Petitioner's 1993 state-court convictions for first-degree (felony) murder, *see* Mich. Comp. Laws § 750.316(1)(b), second-degree murder, *see* Mich. Comp. Laws § 750.317, and possession of a firearm during the commission of a felony (felony firearm), *see* Mich. Comp. Laws § 750.227b. The grounds for relief included in the Petition are: (1) trial counsel provided ineffective assistance when he failed to (a) request an evaluation for competency and criminal responsibility and (b) raise an insanity defense; and (2) Petitioner was denied a fair trial and

effective assistance of counsel because he was required to wear visible shackles at trial and his attorney failed to object to the shackles.   Respondent Ken Tribley ("Respondent") argues that Petitioner's claims are barred by the statute of limitations and in any event lack merit.   (*See* ECF #12.)   The Court agrees. Accordingly, Petition will be **DENIED**.

## II. Background

Petitioner was tried in the Wayne County Circuit Court on two counts of first-degree murder and one count of felony firearm.   The charges arose from a shooting at a drug house in Detroit, Michigan on September 17, 1992.   The victims were fifteen-year-old Bernard Watson ("Watson"), who was a doorman at the house, and twenty-seven-year-old Gary Bechard ("Bechard").   The prosecutor's theory was that Petitioner premeditated the murder of Bechard and killed Watson during a robbery.

The primary evidence against Petitioner came from his accomplice, Len Cameron ("Cameron"), and from Sergeant Deborah Monte ("Sergeant Monte") who testified about Petitioner's pretrial statement to her.   In his statement to Sergeant Monte, Petitioner said that he, Cameron, and two other men had discussed going to the drug house to find a drug dealer nicknamed "Pimp" who had been shooting at people and talking about how he was going to kill everybody.

Petitioner explained to Sergeant Monte that only he and Cameron actually went to the house and that he went along because the doorman (Watson) knew him and would admit him and Cameron into the house. Their plan was to wait for Pimp to arrive and then kill him.

Petitioner initially informed Sergeant Monte that he was armed with an AK .47 before he and Cameron went to the house, but that he handed the rifle to Cameron as soon as they entered the house. Petitioner then told Sergeant Monte that, once inside the house, Cameron pulled out a gun and told Watson to give him drugs and money. According to Petitioner's statement, Cameron ordered Watson to get on the floor, and Cameron told another man in the house to lie on the couch. Petitioner then said that as he walked to the kitchen, he heard two gunshots and then noticed that both victims had been shot. Petitioner claimed that Cameron shot the victims with a .32 or .38 caliber revolver, and that he (Petitioner) had not fired a weapon.

Sergeant Monte testified that, after Petitioner concluded his statement, she asked him whether he had told the truth. Petitioner responded that most of his statement was true. Petitioner then admitted to Sergeant Monte that he had kept the rifle once he was inside the house and had fired one shot, but that he did not see where the shot went.

3

Cameron pleaded guilty to second-degree murder and felony firearm and testified against Petitioner. Cameron described the incident at the drug house differently than Petitioner had described it. Cameron testified that Petitioner entered the house first and that, as he (Cameron) walked up the steps to the house, he heard Petitioner say, "[l]ay down, lay down." Cameron testified that he then heard one gunshot. Cameron said that he subsequently observed Petitioner turn around and shoot the man on the couch in the head with a .32 caliber handgun. Cameron further testified that when he entered the house, he saw Watson lying on the floor. Cameron then admitted to shooting the other man in the back with a rifle.

The medical examiner testified that both victims were shot one inch behind the right ear and that Bechard also was shot in the back. A firearms examiner testified that the .32 caliber spent bullets removed from the victims' heads were fired from the same gun and that the spent .22 caliber bullet removed from Bechard's back was fired by the rifle in evidence. The prosecutor maintained that Petitioner shot the two victims execution style with a .32 caliber revolver.

Petitioner did not testify or present any witnesses. Petitioner's defense was that there was reasonable doubt as to who shot the victims and that Cameron's testimony was not credible because he was an accomplice who was trying to protect himself.

4

On July 30, 1993, the jury found Petitioner guilty of felony firearm, first-degree (felony) murder in connection with Watson's death, and second-degree murder in connection with Bechard's death. On August 18, 1993, the trial court sentenced Petitioner to two years in prison for the felony firearm conviction, followed by life imprisonment for the murder convictions. The sentence for first-degree murder was mandatory life imprisonment without the possibility of parole, but the sentence for second-degree murder was a paroleable term of life imprisonment.

On direct appeal, Petitioner raised several claims about the trial court's rulings, the jury instructions, the prosecutor's rebuttal argument, and the sufficiency of the evidence. The Michigan Court of Appeals was unpersuaded by Petitioner's arguments and affirmed his convictions in an unpublished, *per curiam* opinion. *See People v. Cole*, No. 185844, 1998 WL 1991898 (Mich. Ct. App. Mar. 27, 1998). On February 25, 1999, the Michigan Supreme Court denied leave to appeal. *See People v. Cole*, 459 Mich. 948; 616 N.W.2d 171 (1999) (table).

On June 2, 2010, more than ten years after his conviction, Petitioner filed a motion for relief from judgment in the state court which he raised the claims that now form the basis for the Petition. The trial judge denied Petitioner's motion on the merits, and on December 8, 2011, the Michigan Court of Appeals denied leave to appeal because Petitioner failed to establish entitlement to relief under Michigan

5

2:12-cv-14826-MFL-DRG   Doc # 20   Filed 02/04/15   Pg 6 of 25   Pg ID 820

Court Rule 6.508(D). *See People v. Cole*, No. 305161 (Mich. Ct. App. Dec. 8, 2011). On September 4, 2012, the Michigan Supreme Court denied leave to appeal for the same reason. *See People v. Cole*, 492 Mich. 865; 891 N.W.2d 868 (2012) (table). Finally, on October 12, 2012, Petitioner signed and dated the Petition, and on October 30, 2012, the Clerk of the Court filed the Petition.

### III. The Statute of Limitations

**A. 28 U.S.C. § 2244(d)**

Respondent argues that the petition is barred from substantive review by the statute of limitations. Respondent is correct.

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") established a one-year period of limitation for state prisoners to file federal habeas corpus petitions. *See Wall v. Kholi*, 562 U.S. 545, 131 S. Ct. 1278, 1282-1283 (2011) (citing 28 U.S.C. § 2244(d)(1)). The period of limitations runs from the latest of the following four dates:

> **(A)** the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

> **(B)** the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

      **(C)** the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

      **(D)** the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1)(A)-(D). "The limitation period is tolled, however, during the pendency of a 'properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim.'" *Kholi*, 131 S. Ct. at 1283 (quoting 28 U.S.C. § 2244(d)(2)).

Petitioner is not relying on a newly recognized constitutional right or on newly discovered facts, and he has not alleged that the State created an impediment to filing a timely habeas petition. *Cf.* 28 U.S.C. § 2244(d)(1)(B-D). Consequently, the statute of limitations began to run when Petitioner's convictions "became final by the conclusion of direct review or the expiration of the time for seeking such review." 28 U.S.C. § 2244(d)(1)(A). "Direct review" concludes for purposes of subsection 2244(d)(1)(A) when the availability of direct appeal to the state courts and to the United States Supreme Court has been exhausted. *See Jimenez v. Quarterman*, 555 U.S. 113, 119 (2009). "Until that time, the 'process of direct review' has not 'com[e] to an end' and 'a presumption of finality and legality' cannot yet have 'attache[d] to the conviction and sentence.'" *Id.* at 119-120

(quoting *Barefoot v. Estelle*, 463 U.S. 880, 887 (1983)) (alterations in *Jimenez*).

> The text of § 2244(d)(1)(A), which marks finality as of "the conclusion of direct review or the expiration of the time for seeking such review," consists of two prongs. Each prong—the "conclusion of direct review" and the "expiration of the time for seeking such review"—relates to a distinct category of petitioners. For petitioners who pursue direct review all the way to [the Supreme] Court, the judgment becomes final at the "conclusion of direct review"—when [the Supreme] Court affirms a conviction on the merits or denies a petition for certiorari. For all other petitioners, the judgment becomes final at the "expiration of the time for seeking such review"—when the time for pursuing direct review in [the Supreme] Court, or in state court, expires.

*Gonzalez v. Thaler*, 132 S.Ct. 641, 653-54 (2012).

A petition for a writ of certiorari to review a judgment entered by a state's highest court must be filed in the United States Supreme Court within ninety days after entry of the state court judgment. Sup. Ct. R. 13.1. Petitioner did not seek review in the United States Supreme Court. Therefore, his convictions became final on May 26, 1999, ninety days after the Michigan Supreme Court denied leave to appeal on direct review. The one-year statute of limitations began to run on the following day, *see Miller v. Collins*, 305 F.3d 491, 495 n.4 (6th Cir. 2002), and it expired 365 days later on May 25, 2000.[1] Thus, the Petition is untimely.

---

[1] The year 2000 was a leap year.

Petitioner filed a motion for relief from judgment in state court in 2010, but the filing of that motion did not re-set the limitations clock, nor revive the expired limitations period, because it had already run. *See Vroman v. Brigano*, 346 F.3d 598, 602 (6th Cir. 2003) (quoting *Rashid v. Khulmann*, 991 F. Supp. 254, 259 (S.D. N.Y. 1998)); *see also Hargrove v. Brigano*, 300 F.3d 717, 718 n.1 (6th Cir. 2002). In other words, the tolling provision of § 2244(d)(2) "can only serve to pause a clock that has not yet fully run. Once the limitations period is expired, collateral petitions can no longer serve to avoid a statute of limitations." *Rashid*, 991 F. Supp. at 259. The Petition, therefore, is time-barred, absent equitable tolling of the limitations period or a credible showing of actual innocence. Neither exception applies here.

## B. Equitable Tolling

Although Petitioner has not asked the Court to equitably toll the limitations period, the habeas statute of limitations "is subject to equitable tolling in appropriate cases." *Holland v. Florida*, 560 U.S. 631, 645 (2010). But "a 'petitioner' is 'entitled to equitable tolling' only if he shows '(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way' and prevented timely filing." *Id.* at 649 (quoting *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005)); *see also Hall v. Warden, Lebanon Corr. Inst.*, 662 F.3d 745, 749-50 (6th Cir. 2011) (adopting *Holland's* two-part test for determining

9

whether a habeas petitioner is entitled to equitable tolling).

Petitioner has not demonstrated diligence in pursuing his rights. Indeed, Petitioner has not identified any steps that he took to pursue his rights between the time the Michigan Supreme Court denied leave to appeal following Petitioner's convictions at trial and the time that he filed his motion for relief from judgment in state court – over ten years later. Nor has Petitioner shown that some extraordinary circumstance stood in his way of filing a timely habeas petition.

Petitioner does claim to have a long history of mental illness, and "a petitioner's mental incompetence, which prevents the timely filing of a habeas petition, is an extraordinary circumstance that may equitably toll AEDPA's one-year statute of limitations." *Ata v. Scutt*, 662 F.3d 736, 742 (6th Cir. 2011). But

> [t]o obtain equitable tolling of AEDPA's statute of limitations on the basis of mental incompetence, a petitioner must demonstrate that (1) he is mentally incompetent and (2) his mental incompetence caused his failure to comply with AEDPA's statute of limitations. In short, a blanket assertion of mental incompetence is insufficient to toll the statute of limitations. Rather, a causal link between the mental condition and untimely filing is required.

*Id*.

Petitioner has presented evidence that his father was killed in a motorcycle accident when Petitioner was a child and that his mother abandoned him. This evidence also indicates that Petitioner began smoking marijuana and drinking alcohol at a very young age, that he often gets depressed, and that he has attempted

to commit suicide on several occasions.  Petitioner, however, has not demonstrated that he was mentally incompetent after his convictions became final or that mental incompetence is the reason for his untimely Petition.  Petitioner's showing that he has suffered from depression and has battled substance abuse is not tantamount to a showing that he was mentally *incompetent* – and thus unable to pursue relief – following the Michigan Supreme Court's denial of his application for leave to appeal in 1999.  The fact that Petitioner was able to file this Petition suggests that, at least at this point, he *is* sufficiently competent to assert his right in legal proceedings.  The Court declines to equitably toll the limitations period for alleged mental illness.

## C.  Actual Innocence

Actual innocence, if proved, serves as a gateway through which a habeas petitioner may pass when the impediment to filing a timely habeas petition is expiration of the statute of limitations.  *See McQuiggin v. Perkins*, 133 S. Ct. 1924, 1928 (2013).  But Petitioner has not expressly asserted that he is innocent, and "AEDPA's time limitations apply to the typical case in which no allegation of actual innocence is made."  *Id.* at 1933.

It is at least conceivable that Petitioner's claim that he was not guilty by reason of insanity is a claim of actual innocence.  But even if the Court were to construe the Petition as including this innocence claim, the Court would reject that

11

claim and deny the Petition.

> The Supreme Court has cautioned
>
> > that tenable actual-innocence gateway pleas are rare: "[A] petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." *Schlup* [*v. Delo*, 513 U.S. 298, 329 (1995)]; see *House* [*v. Bell*, 547 U.S. 518, 538 (2006)] (emphasizing that the *Schlup* standard is "demanding" and seldom met).

*Id*. at 1928.

Petitioner has not supported the Petition with any new evidence, and the record does not support a claim of actual innocence by reason of insanity. Indeed, the record is devoid of any evidence – much less new evidence – that could support Petitioner's claim of insanity.

Finally, Petitioner plainly cannot succeed on a more traditional claim of actual innocence – i.e., a claim that he did not commit the act. Petitioner admitted to Sergeant Monte that he participated in a plan to kill "Pimp" at the drug house, that he and Cameron later went to the drug house armed with guns and planning to kill Pimp, and that he fired a gun inside the house. Additional evidence established that Petitioner shot the two victims in the head execution-style with a handgun.

Petitioner has not made a credible showing of actual innocence. Therefore, AEDPA's limitations period applies here and the Petition is time barred.

## IV.  The Petition's Merits

Even if the Petition was timely – and the Court has concluded that it is not – for all the reasons stated below, the Court would still deny the Petition on the merits.

## A.  Standard of Review

The only state court to address Petitioner's claims on the merits was the trial court.  This Court may grant relief only if the state trial court's adjudication of Petitioner's claims on the merits

> (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

> Under the "contrary to" clause [of § 2254(d)(1)], a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause [of § 2254(d)(1)], a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

13

*Williams v. Taylor*, 529 U.S. 362, 412-13 (2000) (O'Connor, J., opinion of the Court for Part II).  "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  *Id*. at 411.

"AEDPA thus imposes a 'highly deferential standard for evaluating state-court rulings,' *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7 (1997), and 'demands that state-court decisions be given the benefit of the doubt,' *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (*per curiam*)."  *Renico v. Lett*, 559 U.S. 766, 773 (2010).  "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision."  *Harrington v. Richter*, 562 U.S. 86, 131 S. Ct. 770,  786 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).  To obtain a writ of habeas corpus from a federal court, a state prisoner must show that the state court's ruling on his or her claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  *Id*., 131 S. Ct. at 786-87.

## B.  Trial Counsel

Petitioner alleges that his trial attorney was ineffective because the attorney failed to refer him to the Forensic Center before trial for an evaluation of criminal

responsibility and competence to stand trial.   Petitioner also contends that his attorney should have asserted an insanity defense at trial.   Petitioner states that he has a lengthy history of mental illness and suicide attempts and that his only viable defense was insanity.

The state trial court reviewed these claims during post-conviction proceedings and rejected them.   The state court pointed out that there was no documentation to support Petitioner's claim of incompetence and that trial counsel was not given any reason to investigate Petitioner's claim of insanity.   That court opined that Petitioner did not have a meritorious insanity defense simply because his childhood was devoid of family support or because he had attempted suicide.

### 1.  Legal Framework

To prevail on a claim of ineffective assistance of counsel, a criminal defendant must show that his counsel's "performance was deficient" and "that the deficient performance prejudiced the defense."  *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  "Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable."  *Id*.

The "deficient performance" prong of the *Strickland* test "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  *Id*.  "Judicial

15

scrutiny of counsel's performance must be highly deferential." *Id.* at 689.

To demonstrate that counsel's performance prejudiced the defense, a defendant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. "This does not require a showing that counsel's actions 'more likely than not altered the outcome,'" but "[t]he likelihood of a different result must be substantial, not just conceivable." *Richter*, 131 S. Ct. at 792 (quoting *Strickland*, 466 U.S. at 693).

An attorney's failure to explore the possibility of a not-guilty-by-reason-of-insanity defense can rise to the level of constitutionally defective counsel. *See Daoud v. Davis*, 618 F.3d 525, 532 (6th Cir. 2010). An assessment of whether an attorney was constitutionally ineffective for failing to explore and assert an insanity defense necessarily requires consideration of the requirements for such a defense. In Michigan, an insanity defense based on mental illness requires a defendant to prove that, due to mental illness he lacked a "substantial capacity either to appreciate the nature and quality of the wrongfulness of his conduct or to conform his conduct to the requirements of the law." *People v. Jackson*, 245 Mich. App. 17, 23-24; 629 N.W.2d 11, 14-15 (2001). And the test for competence to stand trial is whether the defendant "has sufficient present ability to consult with

16

his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him." *Dusky v. United States*, 362 U.S. 402, 402 (1960) (*per curiam*); *United States v. Abdulmutallab*, 739 F.3d 891, 899 (6th Cir.) (stating that "[t]he test for competency to stand trial is whether the defendant has (1) sufficient present ability to consult with a lawyer with a reasonable degree of rational understanding, and (2) a rational and factual understanding of the proceedings against him") (footnote omitted), *cert. denied*, 135 S. Ct. 89 (2014).

### 2. Application

The state trial court concluded that Petitioner was not denied the effective assistance of counsel by his attorney's alleged failure to explore and assert (1) that Petitioner was not competent to stand trial and/or (2) an insanity defense. That conclusion was not unreasonable.

The record contains persuasive evidence that Petitioner was mentally competent and sane at all relevant times. Before his interview with Sergeant Monte two days after the murders, Petitioner accurately read each of his constitutional rights aloud to Sergeant Monte and provided background information about himself and his family. Petitioner had completed the eleventh grade in school, and he was able to provide Sergeant Monte with the names of family members and the telephone numbers for his family and girlfriend. (Trial Tr.

17

Vol. II, 51-54, July 28, 1993; Hr'g Tr., 7-9, 30, Jan. 15, 1993.)

Petitioner subsequently admitted to Sergeant Monte that he had participated in a plan to kill Pimp and that his role in the crime was to help Cameron get into the drug house so that Cameron could kill Pimp. Petitioner provided Sergeant Monte with additional details about what happened in the drug house. Petitioner's statement to Sergeant Monte demonstrates that his conduct was goal-directed and that he was criminally responsible for the crimes, either as a principal or as an aider and abettor. The fact that Petitioner blamed Cameron for the shooting and initially denied firing a gun further suggests that he was capable of devising a version of the facts that was favorable to him. And Petitioner's admission at the conclusion of the interview that he had been untruthful about two details in his statement indicates that he could distinguish between right and wrong.

At the pretrial hearing on the voluntariness of his statement to Sergeant Monte, Petitioner gave further indications that he was both sane and competent to stand trial. Petitioner testified at that hearing and demonstrated that he understood the nature and object of the proceedings against him. Petitioner was also able to assist his attorney in trying to suppress his statement to Sergeant Monte on the ground that his statement was involuntary.

18

To summarize, the record does not support Petitioner's claims that he should have been tested for criminal responsibility and competence to stand trial or that insanity was a viable defense at trial.  Consequently, the state court reasonably concluded that defense counsel was not ineffective for failing to refer Petitioner to the Forensic Center for an evaluation of criminal responsibility and competence to stand trial or for failing to present an insanity defense at trial.  Petitioner's first claim lacks merit and does not warrant habeas relief.

## C.  Shackles

The second and final habeas claim alleges that Petitioner was deprived of a fair trial because he was shackled during trial.  Petitioner contends that his shackles were visible to the jury and that there is no indication in the record that he was disruptive, a security threat, or likely to escape.  Petitioner further alleges that trial counsel was ineffective for failing to object to the shackles.  The state trial court rejected Petitioner's claims on post-conviction review, stating that shackles were an appropriate precaution because Petitioner had a history of escaping and eluding authorities.

### 1.  Legal Framework

"The law has long forbidden routine use of visible shackles during the guilt phase [of a criminal trial]; it permits a State to shackle a criminal defendant only in

the presence of a special need." *Deck v. Missouri*, 544 U.S. 622, 626 (2005).[2]  The use of visible shackles during the guilt phase of a criminal case is forbidden "*unless* that use is 'justified by an essential state interest'—such as the interest in courtroom security—specific to the defendant on trial." *Id*. at 624 (citing *Holbrook v. Flynn*, 475 U.S. 560, 568–69 (1986), and *Illinois v. Allen*, 397 U.S. 337, 343–44 (1970)) (emphasis in original).

> Thus, the Fifth and Fourteenth Amendments prohibit the use of physical restraints visible to the jury absent a trial court determination, in the exercise of its discretion, that they are justified by a state interest specific to a particular trial. Such a determination may of course take into account the factors that courts have traditionally relied on in gauging potential security problems and the risk of escape at trial.

*Id*. at 629.

### 2.  Application

The state trial court did not act unreasonably in rejecting Petitioner's claim that his attorney was ineffective for failing to object to his shackling.  Petitioner never presented sufficient evidence showing that his shackling amounted to a constitutional violation.

---

[2]  Although the Supreme Court decided *Deck* after Petitioner's convictions became final, "the principle that the State cannot as a matter of general policy shackle a defendant predates *Deck*." *Earhart v. Konteh*, 589 F.3d 337, 348 (6th Cir. 2009) (citing *Deck*, 544 U.S. at 626, and *Lakin v. Stine*, 431 F.3d 959, 963 (6th Cir. 2005) (stating, "the principle that shackling a defendant at trial without an individualized determination as to its necessity violates the due process clause was clearly established long before *Deck* was decided.")).

There is no explicit reference to shackles in the transcript of trial.  However, during a break in the *voir dire* proceedings on the first day of trial, the trial court informed defense counsel that someone had brought some clothing for Petitioner to change into.  That court explained that defense counsel would have to take the clothing to the jail and log it in as Petitioner's property before the clothing would be available for Petitioner to change into.  The trial court then said, "[p]art of that is security because of obvious problems."  (Trial Tr. Vol. I, 71, July 27, 1991). And in the trial court's post-conviction order denying Petitioner's motion for relief from judgment, that court stated that Petitioner's rights were not violated by his having to wear shackles during trial.  *See People v. Cole*, No. 92-11196 (Wayne County Cir. Ct. Aug. 11, 2010).  The Court assumes from the trial court's comments in the post-conviction order and at trial that Petitioner was wearing shackles at trial.

*Deck*, however, "concerned only *visible* restraints at trial."  *Mendoza v. Berghuis*, 544 F.3d 650, 654 (6th Cir. 2008) (emphasis in original).  If shackles were not visible, there is no "violation of clearly established federal law sufficient to grant the writ."  *Earhart*, 589 F.3d at 349.

It seems unlikely that the trial court would have let Petitioner appear in court in visible shackles because, when the issue of Petitioner's clothes for trial first arose, the trial court said, "I think that the law is clear I can't require him to sit here

21

in prison or jail garb unless he chooses to." (Trial Tr. Vol. I, 13, July 27, 1993.) Even assuming that Petitioner was wearing visible restraints at trial, the state trial court was not unreasonable in concluding that there was an essential state interest justifying their use:  security and escape prevention.[3]  "[A] trial court need not ignore the reality of the situation[,] and the fact that a defendant has tried to escape already is a highly probative factor for the trial court to consider in making a shackling determination."  *Lakin*, 431 F.3d at 965 n.5.  Therefore, it would not have been an abuse of discretion for the trial court to order the use of shackles, and the state trial court reasonably concluded that defense counsel was not ineffective for failing to object to the shackles.

Finally, the evidence against Petitioner was substantial, and there is no indication that the alleged shackling error contributed to the jury's verdict. The alleged error, therefore, could not have had a "substantial and injurious effect or influence" on the jury's verdict and was harmless.  *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)).  Petitioner has no right to relief on the basis of his second claim.

---

[3] Petitioner's pre-sentence report indicates that he escaped from a detention center, an emergency shelter, and two youth facilities between 1989 to 1990.

## V.  Conclusion

For all of the reasons stated above, the Petition is barred by the statute of limitations. Moreover, even if the Petition was timely, Petitioner would still not be entitled to relief.  The state trial court's adjudication of Petitioner's claims was not contrary to Supreme Court precedent, an unreasonable application of Supreme Court precedent, or an unreasonable determination of the facts.  Adjudication of the issues certainly was not "so lacking in justification that there was an error . . . beyond any possibility for fairminded disagreement." *Burt v. Titlow*, 134 S. Ct. 10, 16 (2013) (quoting *Richter*, 131 S.Ct. at 786–87).  Therefore,

**IT IS ORDERED THAT** the Petition for Writ of Habeas Corpus (ECF #1) is **DENIED** and dismissed with prejudice.

## VI.  Certificate of Appealability and the Appellate Filing Fee

"[A] prisoner seeking postconviction relief under 28 U.S.C. § 2254 has no automatic right to appeal a district court's denial or dismissal of the petition. Instead, [the] petitioner must first seek and obtain a [certificate of appealability.]" *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).  A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).

> Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable

jurists would find the district court's assessment of the constitutional claims debatable or wrong. . . .  When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a [certificate of appealability] should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.

*Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

Because Petitioner's claims are clearly barred from review by the one-year statute of limitations, reasonable jurists would not find it debatable whether the Court's procedural ruling was correct.  And because the habeas petition does not state a valid claim of the denial of a constitutional right, reasonable jurists would not find the Court's assessment of Petitioner's claims debatable or wrong. Accordingly,

**IT IS ORDERED THAT** a certificate of appealability is **DENIED**.

**IT IS FURTHER ORDERED THAT**, if Petitioner appeals this Court's decision, he may not proceed *in forma pauperis* on appeal because an appeal could not be taken in good faith.   28 U.S.C. § 1915(a)(3).


s/Matthew F. Leitman
MATTHEW F. LEITMAN
UNITED STATES DISTRICT JUDGE

Dated:  February 4, 2015

24

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on February 4, 2015, by electronic means and/or ordinary mail.

s/Holly A. Monda
Case Manager
(313) 234-5113